[Cite as *State v. Irwin*, 2012-Ohio-2704.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| V. | ) | CASE NO. 11-CO-6 |
| | ) | |
| ANDREW G. IRWIN, | ) | OPINION |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from Court of Common Pleas of Columbiana County, Ohio Case No. 06CR303

JUDGMENT: Affirmed

APPEARANCES:
For Plaintiff-Appellee

Robert L. Herron
Prosecutor
Ryan P. Weikart
Assistant Prosecutor
105 South Market Street
Lisbon, Ohio 44432

For Defendant-Appellant

Atty. Douglas A. King
91 West Taggart Street
P.O. Box 85
East Palestine, Ohio 44413

JUDGES:

Hon. Gene Donofrio
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated: June 12, 2012

DONOFRIO, J.

{¶1} Defendant-appellant, Andrew Irwin, appeals from a Columbiana County Common Pleas Court judgment convicting him of murder, following a jury trial.

{¶2} Appellant's heroin dealer was 21-year-old Emily Foreman. At 3:57 p.m. on August 23, 2006, appellant placed a phone call to 911 requesting an ambulance to the home where Foreman stayed with her mother, Kim Koerber. At 4:10 p.m., appellant called the East Liverpool Police Department once again requesting an ambulance. He told the dispatcher that his name was "Andy" and that there had been a stabbing. East Liverpool Police Officers Kelsey Hedrick and Fred Flati arrived on the scene as did the paramedics. As the officers approached the house, appellant exited, shirtless and covered in blood. Appellant told the officers, "She's in there" and pointed inside the house. Appellant then sat on the front steps of the house.

{¶3} The police and paramedics located Foreman lying on the floor of a ransacked, blood-covered bedroom. She had several stab wounds and was bleeding. Foreman was able to tell the officers her name and that she could not breathe but they did not ask her who stabbed her. The paramedics transported Foreman to East Liverpool City Hospital where she died as a result of stab wounds that punctured her lungs.

{¶4} According to paramedic Jason Lively, when he asked appellant what happened, appellant said that "she" attacked him, so he stabbed her and the knife was inside the house. Appellant denied making this statement.

{¶5} Officer Hedrick questioned appellant in the living room of the house. According to Officer Hedrick, appellant told him his name and that, "I came here to buy dope. She tried to stab me."

{¶6} Upon discovering that there was an outstanding warrant for appellant's arrest on a trespassing charge, police took him into custody on the warrant. Before he was handcuffed, appellant took a small, clean paring knife out of his pocket and tossed it on the couch. The large serrated steak knife used to stab Foreman was still in the bedroom covered with blood.

{¶7} Officer Hedrick along with East Liverpool Police Chief Michael McVay transported appellant to the jail. In the cruiser, appellant stated that he had treated his mother badly and mentioned being in rehab for drug use. He then stated that he hoped God and his child could forgive him.

{¶8} Upon searching Foreman's house, police observed that the bedroom where she was stabbed was in disarray. Her purse was dumped out. The bed was knocked out of alignment. A serrated knife was on the bed. Blood stains were in numerous places. Additionally, in the kitchen police found a hypodermic needle, a cell phone with blood stains, and a wax-like material commonly used in the storage of heroin.

{¶9} Fingerprint and DNA evidence indicated that appellant had been inside Foreman's house.

{¶10} A Columbiana County grand jury indicted appellant on one count of murder, a first-degree felony in violation of R.C. 2903.02(A).

{¶11} The matter proceeded to trial and the jury found appellant guilty as charged. Appellant filed a motion for new trial based on newly discovered evidence. The trial court denied the motion for new trial.

{¶12} Appellant appealed from his judgment of conviction and from the judgment denying his motion for new trial. On appeal, this court reversed appellant's conviction based on ineffective assistance of counsel and cumulative error and remanded the matter for a new trial. *State v. Irwin*, 184 Ohio App.3d 764, 2009-Ohio-5271, 922 N.E.2d 981 (7th Dist.).

{¶13} On remand, the matter went to trial once again. And once again, the jury found appellant guilty of murder. The trial court subsequently sentenced appellant to 15 years to life in prison.

{¶14} Appellant filed a timely notice of appeal on February 23, 2011.

{¶15} Appellant now raises 11 assignments of error. We will address them out of order for ease of discussion.

{¶16} Appellant's second assignment of error states:

DEFENDANT/APPELLANT WAS DENIED A FAIR TRIAL BECAUSE OF IMPROPER TESTIMONY BY CHIEF BURGESS WHICH VIOLATED THE DEFENDANT/APPELLANT'S DUE PROCESS RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

**{¶17}** During the state's opening statement, the prosecutor told the jury about a comment appellant made to Chief McVay during transport to the county jail: "I'd tell you what really happened, but you're recording." (Tr. 184). Additionally, Liverpool Township Police Chief Charlie Burgess testified that he did not interview appellant because appellant had requested a lawyer. (Tr. 542-543). And in cross-examining appellant, the prosecutor asked questions concerning appellant's decision to invoke his right to remain silent and his right to counsel instead of talking to Chief Burgess. (Tr. 1209-1210, 1213, 1216). Finally, in the state's closing argument, the prosecutor commented on appellant's post-arrest silence again. (Tr. 1272, 1278, 1336, 1343).[1]

**{¶18}** Appellant argues that the state violated his right to remain silent and his right to counsel by using his post-arrest silence as substantive evidence in its case-in-chief. He further asserts that the trial court erred in failing to immediately instruct the jury that he had a constitutional right to request an attorney and that such request could not be used against him.

**{¶19}** An accused who asserts his Fifth Amendment right to silence should not have that assertion used against him. *State v. Treesh*, 90 Ohio St.3d 460, 479, 739 N.E.2d 749 (2001), citing *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d

---

1 Appellant failed to object to most of the comments/questions he now takes issue with in this assignment of error. Likewise, he failed to raise objections to many of the evidentiary issues he takes issue with in assignments of error three through nine. However, in his second assignment of error he asserts that his counsel was ineffective for failing to raise these objections. Generally, the failure to object to an alleged error waives all but plain error. *State v. Krupa*, 7th Dist. No. 09–MA–135, 2010–Ohio–6268, ¶57. But a defendant's claim that he was denied effective assistance of counsel eliminates the requirement that an objection be made in order to preserve an error for appeal. *Id.*, citing *State v. Carpenter*, 116 Ohio App.3d 615, 621, 688 N.E.2d 1090 (2d Dist. 1996). As such, we will review all of appellant's alleged errors despite his lack of objections.

91 (1976). Silence includes the accused's desire to remain silent until he has consulted an attorney. *Id.*, citing *Wainwright v. Greenfield*, 474 U.S. 284, 295, 106 S.Ct. 634, 88 L.Ed.2d 623, fn. 13 (1986).

**{¶20}** Firstly, the prosecutor's comment during opening statements was not a comment on appellant's post-arrest silence. Instead, the prosecutor was telling the jury about a conversation appellant initiated with Chief McVay during his transport to jail. (Tr. 184). One of his comments to Chief McVay was, "I'd tell you what really happened, but you're recording." (Tr. 184). Officer Hedrick, who was driving the police cruiser, testified that the cruiser they were riding in had a camera mounted on the window shield. (Tr. 382). He stated that the camera was not on and they were not recording appellant, however, he could understand why appellant thought that they were. (Tr. 382).

**{¶21}** Secondly, it was not the prosecutor who first elicited Chief Burgess's testimony about attempting to interview appellant. During cross-examination, in attempting to show that Chief Burgess did not conduct a thorough investigation, defense counsel asked Chief Burgess if he interviewed appellant. (Tr. 534). Chief Burgess responded that he did not. (Tr. 534). Consequently, on redirect examination, the prosecutor asked Chief Burgess why he did not interview appellant. (Tr. 542). Chief Burgess stated that he had Mirandized appellant and appellant wanted a lawyer. (Tr. 543).

**{¶22}** Where a party chooses to open the door to otherwise inadmissible testimony, it is within the court's discretion to allow the other party to elicit additional clarifying testimony on the same issue. *State v. Collins*, 7th Dist. No. 10-CO-10, 2011-Ohio-6365, ¶93. The clarifying testimony is allowed in order to rebut any false impressions that may have resulted from the earlier testimony. *Id.*, citing *State v. Dunivant*, 5th Dist. No.2003CA00175, 2005–Ohio–1497, ¶12.

**{¶23}** Because it was the defense and not the state that initially opened the door to Chief Burgess's lack of interviewing appellant, the state was permitted to ask the Chief why he did not interview appellant. If the state was not permitted to do so,

the jury would have been left with the impression that Chief Burgess did not conduct a complete investigation because he failed to interview appellant.

**{¶24}** Thirdly, appellant once again opened the door to questions about his post-arrest silence during his direct testimony. Appellant testified that at the scene he tried to tell the officers what had happened, but he did not get a chance to do so. (Tr. 1185). He also testified that at the police station, he did not make any statements to police. (Tr. 1189). Consequently, on cross-examination, the prosecutor asked appellant if he heard Chief McVay testify that he would not talk and instead asked for a lawyer. (Tr. 1209). Appellant had also indicated that he feared for his family's safety and that is why he did not talk to police. And he stated that he did not have any information as to who stabbed Foreman. (Tr. 1193). So on cross-examination the prosecutor questioned him as to what he had to fear if he did not know who stabbed Foreman. (Tr. 1213, 1216).

**{¶25}** Finally, the prosecutor's comments on appellant's silence during closing arguments were simply restating the above evidence, which was all admissible.

**{¶26}** Accordingly, appellant's second assignment of error is without merit.

**{¶27}** Appellant's third assignment of error states:

> DEFENDANT/APPELLANT WAS DENIED A FAIR TRIAL DUE TO THE INTRODUCTION INTO EVIDENCE AND/OR TESTIMONY REGARDING MULTIPLE PRIOR BAD ACTS OF DEFENDANT/APPELLANT.

**{¶28}** Appellant contends here that it was error to admit evidence of his prior bad acts. He cites to numerous examples of bad acts evidence that he claims "littered" the record.

**{¶29}** The admission or exclusion of evidence is within the trial court's broad discretion and this court will not reverse its decision absent an abuse of that discretion. *State v. Mays*, 108 Ohio App.3d 598, 617, 671 N.E.2d 553 (1996). Abuse of discretion connotes more than an error of law or judgment; it implies that the trial

court's judgment was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶30}** Evidence of prior bad acts is inadmissible for proving that the accused acted in conformity with his bad character. *State v. Treesh*, 90 Ohio St.3d 460, 482, 739 N.E.2d 749 (2001); Evid.R. 404(B).

**{¶31}** First, appellant takes issue with testimony that he had an outstanding warrant for his arrest on a trespassing charge at the time of the murder. (Tr. 304, 362, 454, 715).

**{¶32}** But this testimony was necessary to show why appellant was initially placed under arrest and transported to the police station.

**{¶33}** Second, appellant takes issue with testimony that he had made attempts at drug rehab (Tr. 381), he treated his mother like "shit" (Tr. 717), he had track marks on his arms (Tr. 467), his mother threw him out of her house for abusing drugs (Tr. 603), he is a heroin addict who has stolen from his mother (Tr. 604, 717), he stole his mother's van (Tr. 608, 617), his mother filed trespass charges against him (Tr. 609), he "ripped off" a drug dealer (Tr. 610), he shot up heroin in the back of his mother's van (Tr. 608, 648-650), and he asked his mother for money to buy drugs (Tr. 1126-1127).

**{¶34}** All of this testimony was introduced to support the state's theory of the case, which was that appellant was so desperate for heroin that he murdered Foreman in order to obtain it. The state further attempted to show that appellant needed heroin so badly on the day of the murder that he solicited his mother's help, even though she had banned him from her house and filed trespassing charges against him.

**{¶35}** Third, appellant takes issue with testimony that he threatened to slice the throat of his son's mother. (Tr. 1223).

**{¶36}** But there was no testimony that appellant made this statement. The prosecutor asked him if he had made it and appellant said he did not. (Tr. 1223).

**{¶37}** Fourth, appellant takes issue with testimony that he stated he would

spit in the face of his son's mother. (Tr. 1223-1224).

{¶38} There was no testimony that appellant actually made this statement. Furthermore, the trial court sustained defense counsel's objection to the question by the prosecutor regarding this statement. (Tr. 1224).

{¶39} Additionally, appellant asserts that the trial court should have sustained his objection to the admission of three items found in his mother's, Cheryl Carpenter's, van because they were not found at the murder scene.

{¶40} Chief Burgess testified that on the day following the murder, he recovered a crack pipe, a heroin spoon, and a heroin stamp packet from the rear area of Carpenter's van. (Tr. 494-498; State Ex. 10, 11, 40). These items were likely introduced to corroborate Carpenter's testimony that after appellant got back into her van after his first trip to Foreman's house, he shot up heroin in the back of her van. (Tr. 624-626).

{¶41} As can be seen from the above discussion of the alleged improper evidence, none of the evidence was introduced for the purpose of showing that appellant acted in conformity with his bad character when he stabbed Foreman. Thus, we cannot conclude that the trial court abused its discretion in allowing the testimony and exhibits.

{¶42} Accordingly, appellant's third assignment of error is without merit.

{¶43} Appellant's fourth assignment of error states:

DEFENDANT/APPELLANT WAS DENIED A FAIR TRIAL DUE TO IMPROPER CHARACTER EVIDENCE.

{¶44} Appellant argues that the state used improper character evidence to show that he acted in conformity with his bad character.

{¶45} Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Evid.R. 404(A).

{¶46} Appellant first takes issue with several statements by the prosecutor

during opening statements that appellant was a drug addict who stole from his mother (Tr. 169-170), appellant shot up heroin in his mother's van in her presence (Tr. 173), and appellant stole a check from his mother (Tr. 174).

**{¶47}** These comments during opening statements were a recitation of appellant's actions on the day of the murder. The evidence demonstrated that during the hours leading up to the murder, appellant, who was desperate for drugs, convinced his mother to drive him to Foreman's house where he purchased heroin, that he shot up the heroin in his mother's van, and that he then stole a check from his mother's checkbook that he tried to use to purchase more heroin from Foreman.

**{¶48}** Appellant also takes issue with numerous questions by the prosecutor addressed to Carpenter including asking her if appellant was untrustworthy (Tr. 605), whether appellant harassed her for money (Tr. 606), whether appellant got angry while trying to get money to feed his addiction (Tr. 606), and what kind of person shoots up heroin in front of his mother (Tr. 627).

**{¶49}** As to the question regarding appellant not being bothered by shooting up heroin in front of his mother, defense counsel objected and the court sustained the objection. (Tr. 627). As to the other questions posed to Carpenter, they were focused at establishing that appellant had a drug addiction.

**{¶50}** Finally, appellant takes issue with questions the prosecutor asked him on cross- examination including asking him to admit that his own mother did not want him in her house because he was dishonest (Tr. 1199) and asking him about his willingness to steal from his mother (Tr. 1200).

**{¶51}** Appellant opened the door to these questions during his direct testimony. He admitted that he stole a check from his mother and wrote it out to Foreman. (Tr. 1166). He further admitted that he lied to his mother because he did not want her to know what he was doing. (Tr. 1166-1167). Thus, the prosecutor's questions on cross-examination did not bring to light anything that appellant had not already testified to.

**{¶52}** In conclusion, the trial court did not abuse its discretion in admitting the

above cited-to comments and questions. Accordingly, appellant's fourth assignment of error is without merit.

{¶53} Appellant's fifth assignment of error states:

THE INTRODUCTION INTO EVIDENCE OF MULTIPLE PHOTOGRAPHS OF DEFENDANT/APPELLANT HANDCUFFED TO A BENCH AT THE POLICE DEPARTMENT WAS UNFAIRLY PREJUDICIAL AND CUMULATIVE AND SUCH PREJUDICE OUTWEIGHED ANY PROBATIVE VALUE.

{¶54} At trial, the state introduced photographs of appellant handcuffed to a bench at the police station. (State Exs. 44, 48, 51, 52, 53, 58).

{¶55} Appellant argues that these photographs were highly prejudicial and offered little, if any, probative value. He asserts that the state offered them to suggest to the jury that he was incapable of self-restraint.

{¶56} The admission of photographs is within the trial court's discretion. *State v. Slagle*, 65 Ohio St.3d 597, 601, 605 N.E.2d 916 (1992), citing, Evid.R. 403, Evid.R. 611(A). A reviewing court will not interfere with the trial court's weighing of probativeness and prejudice unless the trial court has clearly abused its discretion resulting in material prejudice to the defendant. *Id.* "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

{¶57} The photographs appellant takes issue with were introduced during Chief Burgess's testimony. He stated that he encountered appellant when he walked into the East Liverpool Police Department. (Tr. 466). He stated that he observed appellant on a security bench, which the police can handcuff a person to. (Tr. 466). The Chief testified that appellant's demeanor "didn't seem out of the ordinary" but that he had blood covering his torso and clothing. (Tr. 466). Chief Burgess later described each of the photographs and pointed out the blood on appellant in each one on different parts of appellant's body and clothing. (Tr. 474-

479).

**{¶58}** Appellant denied stabbing Foreman. It was the state's burden to prove that he did. One way to help prove this was to demonstrate to the jury the numerous places appellant had blood on him. Thus, the photographs had probative value.

**{¶59}** The photographs appellant takes issue with were only six out of a series of fifteen documenting the blood on various parts of appellant's body and clothing. The way the other photographs were taken did not show appellant's handcuffed hand. Furthermore, in the photographs that did show appellant's handcuffed hand, the hand was not the main focus of the picture but was merely visible in the background. And Chief Burgess did not imply in any way that appellant was incapable of self-restraint. To the contrary, he testified that appellant's demeanor was not out of the ordinary.

**{¶60}** Moreover, Chief McVay testified that appellant was arrested on a trespassing warrant and transported to the police department. (Tr. 714715). He went on to testify that handcuffing someone who was under arrest to the bench was "standard procedure." (Tr. 728-729). Hence, the evidence was that appellant was handcuffed to the bench because he was arrested on a trespassing warrant and it is normal procedure to do this, not that appellant was incapable of self-restraint.

**{¶61}** Thus, the prejudicial effect of appellant's handcuffed hand appearing in some photographs was not significant. As such, the trial court did not abuse its discretion in allowing the introduction of the contested photographs. Accordingly, appellant's fifth assignment of error is without merit.

**{¶62}** Appellant's sixth assignment of error states:

DEFENDANT/APPELLANT WAS DENIED A FAIR TRIAL BASED ON THE TRIAL COURT'S ADMISSION INTO EVIDENCE OF INADMISSIBLE HEARSAY.

**{¶63}** Appellant argues here that several instances of hearsay denied him of his right to a fair trial.

**{¶64}** Hearsay is an out-of-court statement, offered in court, to prove the truth of the matter asserted. Evid.R. 801(C). Generally, hearsay is inadmissible. Evid.R. 802.

**{¶65}** First, appellant takes issue with Officer Hedrick's testimony regarding heroin addiction and addicts because his testimony was couched in terms of what he had been told regarding this topic. (Tr. 385).

**{¶66}** Officer Hedrick testified that he has had training regarding illegal drugs. (Tr. 385). He also stated he had knowledge regarding the effects of heroin. (Tr. 384-385). Officer Hedrick then testified: "From speaking with heroin addicts, they'll tell you that they do it originally to get high, but as they get addicted to heroin, they do it to be normal." (Tr. 385). This was the only testimony that was couched in terms of what he had been told on this subject and it came in a general discussion of heroin and its effects. Furthermore, as the state points out, appellant's counsel also questioned Officer Hedrick regarding the effects of heroin on addicts based on his familiarity with drug users and their behavior. (Tr. 404-406).

**{¶67}** The statement appellant takes issue with was not inadmissible hearsay. It was included in a broad discussion about heroin's effects and was part of Officer Hedrick's observations as a police officer who deals with drugs.

**{¶68}** Second, appellant takes issue with Carpenter's testimony that she had been told by everybody that appellant had stabbed Foreman. (Tr. 644).

**{¶69}** Appellant takes Carpenter's testimony out of context here. The prosecutor was questioning Carpenter about appellant calling her from jail. (Tr. 643-644). The prosecutor asked if she was upset with appellant at that time. (Tr. 644). Instead of simply responding "yes," Carpenter tried to qualify her answer by blaming her anger with appellant on other people who she claimed told her appellant stabbed Foreman. (Tr. 644). Hence, the state was not soliciting this statement to prove the truth of the matter asserted. In other words, the statement was not offered to prove that appellant stabbed Foreman. Instead, the state was trying to establish that Carpenter was angry with appellant.

{¶70} Finally, appellant takes issue with Carpenter's testimony that Chief McVay and Captain Curtis of the East Liverpool Police Department had stated they had no doubt that appellant murdered Foreman. (Tr. 677).

{¶71} Again appellant takes Carpenter's testimony out of context. Carpenter testified earlier that she repeatedly told officers, including Chief Burgess and Captain Curtis, that appellant did not commit the murder. (Tr. 666). But this testimony was inconsistent with a statement she gave to Chief Burgess. (Tr. 676-677). When asked about her inconsistent statements, Carpenter tried to blame Chief McVay and Captain Curtis by stating that they told her that appellant did it. (Tr. 676-677). Once again the prosecutor did not solicit this statement to prove the truth of the matter asserted. Instead, the prosecutor was attempting to impeach Carpenter with her prior inconsistent statement and she tried to defend the inconsistency by claiming that Chief McVay and Captain Curtis were pressuring her, which resulted in her statement.

{¶72} Based on the above reasoning, we cannot conclude that the trial court abused its discretion in admitting the above testimony. Accordingly, appellant's sixth assignment of error is without merit.

{¶73} Appellant's seventh assignment of error states:

DEFENDANT/APPELLANT WAS DENIED A FAIR TRIAL DUE TO THE INTRODUCTION OF INADMISSIBLE OPINION EVIDENCE.

{¶74} During Carpenter's testimony, the prosecutor asked her whether or not she made a statement to Chief Burgess that she believed appellant murdered Foreman. (Tr. 677).

{¶75} Appellant argues that this was improper opinion testimony on the ultimate issue to be decided by the jury.

{¶76} Testimony on an ultimate issue to be decided by the jury is not inadmissible per se in Ohio. *State v. Smith*, 12th Dist. No. CA2010-05-047, 2011-Ohio-1476, ¶103 citing *Bostic v. Connor*, 37 Ohio St.3d 144, 524 N.E.2d 881 (1988),

paragraph three of the syllabus. However, the decision whether to admit or exclude such testimony is within the trial court's discretion. *Id.*

**{¶77}** "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Evid.R. 704. Pursuant to the Staff Notes of Evid.R. 704, "[o]pinion testimony on an ultimate issue is admissible if it assists the trier of the fact, otherwise it is not admissible."

**{¶78}** The prosecutor did not elicit Carpenter's statement on this issue in order to present her opinion on whether or not appellant was guilty of murder.

**{¶79}** Carpenter testified that she repeatedly told the police that appellant did not commit the murder. (Tr. 666, 677). But in her statement to Chief Burgess, Carpenter stated the opposite. (Tr. 677). She told Chief Burgess, "I probably believe he did it." (Tr. 677). The prosecutor offered this statement in order to impeach Carpenter. Thus, it was helpful to the jury in judging Carpenter's credibility. For this reason, it was within the trial court's discretion to admit the testimony.

**{¶80}** Accordingly, appellant's seventh assignment of error is without merit.

**{¶81}** Appellant's eighth assignment of error states:

> DEFENDANT/APPELLANT WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT SENT TRANSCRIPTS OF THE TAPE RECORDED 911 CALL INTO THE JURY ROOM DURING DELIBERATIONS WITH NO LIMITING INSTRUCTION SPECIFICALLY REGARDING THE USE OF THE TRANSCRIPTS.

**{¶82}** One of the 911 calls made by appellant was played for the jury. (Tr. 264; State Ex. 2). The trial court also permitted the jury to have a transcript of the 911 call. (State Ex. 3). The 911 dispatcher, Marilyn Wickline, testified that she could hear a faint female voice asking for help in the background during the 911 call. (Tr. 261, 265). However, the female voice was not audible on the recording that was played for the jury. (Tr. 277). It also was not documented in the transcript of the call

(State Ex. 3) even though appellant argues in his brief that the transcript reflected the faint voice asking for help.  Appellant argues that the recording itself was the best evidence and the court should not have allowed the jury to have the transcript.

**{¶83}** Generally, in order to prove the content of a recording, the original recording is required.  Evid.R. 1002.

**{¶84}** Here, the original recording was played for the jury.  And the transcript accurately depicted the conversation that was played.  (Tr. 265).  The court admitted both the tape recording of the 911 call and the transcript.  (Tr. 265).  Thus, the original recording was provided to prove the content of the 911 call in accordance with Evid.R. 1002.

**{¶85}** Additionally, while Wickline testified that she heard a faint female voice asking for help in the background, this voice is not audible on the tape recording nor is it documented in the transcript.  There are no inconsistencies between the tape and the transcript. Thus, the transcript did not cause appellant any prejudice as appellant argues.

**{¶86}** Accordingly, appellant's eighth assignment of error is without merit.

**{¶87}** Appellant's first assignment of error states:

DEFENDANT/APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

**{¶88}** Appellant contends that his counsel was ineffective in three different ways.

**{¶89}** To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Second, appellant must demonstrate that he was prejudiced by counsel's performance.  *Id.*  To show that he has been prejudiced by counsel's deficient

performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley*, at paragraph three of the syllabus.

**{¶90}** Appellant bears the burden of proof on the issue of counsel's effectiveness. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In Ohio, a licensed attorney is presumed competent. *Id.*

**{¶91}** Firstly, appellant argues that his counsel should have called Lindsay Jason Beaver and Julie Conyer to testify. He points out that in *Irwin*, supra, in reviewing appellant's motion for a new trial, this court found that Beaver's and Conyer's testimony could have been helpful to appellant because their testimony was independent and corroborative of each other and created a strong possibility of creating a different outcome at trial. *Id.* at ¶190. Yet despite what appellant terms as our "almost specific instructions" to counsel to call these witnesses at his new trial, his counsel failed to do so. He argues that the failure to call these witnesses was prejudicial in light of this court's previous findings.

**{¶92}** Appellant's counsel obviously made a strategic choice not to call Beaver and Conyer because their testimony would have directly contradicted appellant's testimony. Appellant testified that on the day of the murder he was alone with Foreman at her house hanging out. (Tr. 1173). He stated that he nodded off in the backyard, awoke, went into the house, heard moaning, and found Foreman bleeding in the bedroom. (Tr. 1178-1181). He stated that he dumped out Foreman's purse looking for her cell phone to call 911. (Tr. 1181).

**{¶93}** Beaver testified at the previous motion for new trial hearing that a man named Greg Todd had confessed to murdering Foreman. *Irwin*, at ¶179. Beaver further testified that Todd told him that he went with appellant to Foreman's house on the day of the murder to rob Foreman of her heroin. *Id.* Beaver stated that Todd told him a struggle ensued when Foreman began swinging a knife at him. *Id.* Beaver testified Todd stated that appellant grabbed Foreman's arm while he got the drugs out of her purse. *Id.* Beaver testified Todd stated that he took the knife from Foreman and stabbed her. *Id.*

**{¶94}** Additionally, Conyer testified at the motion for new trial hearing that she heard from a third party that Todd had stated appellant knew he was guilty and was "taking the fall" for him. *Id.* at ¶176. Conyer also testified the same person told her that Todd had stated both he and appellant were at Foreman's house on the day of the murder. *Id.*

**{¶95}** Clearly, Beaver's account of what Todd had relayed to him contradicted appellant's testimony at trial as did Conyer's testimony. According to Beaver's and Conyer's testimony, appellant and Todd were at Foreman's house together. But according to appellant, he was there alone and saw no one else. And according to Beaver's testimony, Todd went through Foreman's purse looking for drugs. But according to appellant, he dumped out the purse looking for Foreman's cell phone to call 911. Thus, defense counsel had a strategic decision to make. Counsel could not call Beaver and Conyer to testify and also allow appellant to testify because the jury would have to find that at least one of them was lying. We will not second-guess the strategic decisions of trial counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 545 (1995).

**{¶96}** Additionally, appellate counsel states that he reviewed trial counsel's file on this case and found that two other witnesses had information that would have corroborated Beaver's and Conyer's testimony.

**{¶97}** This assertion relies on evidence outside of the record. While evidence may exist outside the record to support an appellant's contention of ineffective assistance, a direct appeal is not the proper place to present this evidence. Instead, this is an issue for postconviction relief. *Calhoun*, 86 Ohio St.3d at 289.

**{¶98}** Next, appellant argues that his counsel should not have agreed to submit his motion to suppress and motion in limine for decision on a non-oral basis. He asserts that by failing to argue these motions at a hearing, his counsel did not make of record of the facts and circumstances upon which the trial court could determine the motions.

**{¶99}** Appellant's motion to suppress sought to suppress statements he

made to police that he went to Foreman's house to buy drugs and that she tried to stab him. The trial court already held a hearing on appellant's identical motion to suppress prior to his first trial. Thus, the court did have a factual basis on which to issue its decision.

{¶100} Appellant's motion in limine sought to suppress the 911 dispatcher's testimony that when appellant called she heard a faint female voice say "help me," on the basis that this statement was inadmissible hearsay. The trial court did not need to hold a fact-finding hearing on whether the testimony was hearsay. This was simply a legal determination of whether the statement fit the definition of hearsay.

{¶101} Thus, counsel was not ineffective for agreeing to submit these motions on a non-oral basis.

{¶102} Finally, appellant argues that his counsel failed to object to improper evidence, questions, and comments. He takes issue with eight different instances.

{¶103} The first seven of these instances are the identical issues appellant raises in assignments of error two through eight. We have already determined that the admission of the contested evidence and comments in assignments of error two through eight was within the trial court's discretion. Consequently, trial counsel was not ineffective for failing to raise objections on these issues.

{¶104} The eighth instance concerns a lack of DNA testing. Appellant contends that his counsel should have ordered DNA testing on the items found in the room where Foreman was murdered to establish whether someone else's DNA was present other than his, Foreman's, and Foreman's mother's. He argues this could have helped establish his defense that someone else murdered Foreman.

{¶105} DNA testing was performed on numerous items found at the murder scene including Foreman's purse, the murder weapon, a tee shirt, a beer bottle, a stain on the counter, appellant's shoe, appellant's shorts, and a paring knife (State Exs. 14, 15, 17, 18, 19, 20, 21, 22). Of these items, the DNA inside of the purse was consistent with both appellant and Foreman. (Tr. 919). The DNA from the murder weapon, the tee shirt, the counter, appellant's shoe, and appellant's shorts was

consistent with Foreman's DNA. (Tr. 920). The DNA from the beer bottle was consistent with appellant's DNA. (Tr. 921). And no blood was found on the paring knife. (Tr. 925).

{¶106} Other items were submitted to the Bureau of Criminal Identification and Investigation (BCI), but were not tested. (Tr. 926). This was because there was no request to test them. (Tr. 935). These items included bed sheets, a comforter, a paper wrapper, a swab from the kitchen faucet, a swab from a smoking device, appellant's socks and underwear, swabs from Foreman's hands, and swabs from a syringe. (Tr. 927).

{¶107} In cross-examining Linda Eveleth, the BCI DNA examiner, defense counsel spent a considerable amount of time questioning her as to why these items were not tested. Counsel first asked Eveleth who determines what items are helpful in a case so that they are DNA-tested. (Tr. 934-936). She responded that it was up to the prosecutor. (Tr. 935). Counsel then went through each item that was not tested and asked why it was not tested, to which Eveleth responded that no testing was requested. (Tr. 940-941, 945-951). Defense counsel had a clear strategy of attempting to show that the prosecutor's office did not conduct a thorough investigation in this case. If counsel had ordered further DNA testing, it would have undermined this strategy. As this was a strategic decision on defense counsel's part, we will not second-guess it. *Carter*, 72 Ohio St.3d at 558.

{¶108} Accordingly, appellant's first assignment of error is without merit.

{¶109} Appellant's ninth assignment of error states:

DEFENDANT/APPELLANT WAS DENIED A FAIR TRIAL AND THEREFORE DUE PROCESS BECAUSE OF PROSECUTORIAL MISCONDUCT.

{¶110} Appellant argues here that the prosecutor committed misconduct by repeatedly referring to the fact that appellant invoked his rights to remain silent and to counsel, by offering evidence of his prior bad acts, by eliciting hearsay, and by

making improper comments during closing argument.

**{¶111}** Other than the alleged improper closing argument comments, the issues raised here mirror those addressed in appellant's previous assignments of error. As we have already addressed those issues, we will not repeat the analyses here.

**{¶112}** The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial. *State v. Fears*, 86 Ohio St.3d 329, 332, 715 N.E.2d 136 (1999). In reviewing a prosecutor's alleged misconduct, a court should look at whether the prosecutor's remarks were improper and whether the prosecutor's remarks affected the appellant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "[T]he touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, ¶61, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940 (1982). An appellate court should not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶121.

**{¶113}** As to the closing argument comments, appellant takes issue with three groups of comments by the prosecutor.

**{¶114}** First, he contends the prosecutor stated that it was the jury's duty to find appellant guilty. (Tr. 1324, 1361-1362). But appellant takes these statements out of context. The prosecutor stated that the jury had a responsibility to hold Foreman's killer responsible for his actions, not to hold appellant responsible. (Tr. 1324). Then, after arguing the evidence, the prosecutor asked the jurors to follow their consciences. (Tr. 1361-1362). He also asked the jury to find appellant guilty stating that justice demanded that verdict. (Tr. 1362). The prosecutor's final statement was, "I ask you to do your duty." (Tr. 1362). Thus, the prosecutor never stated that it was the jury's duty to convict appellant.

**{¶115}** Second, appellant takes issue with the statement that he was

addicted to heroin. (Tr. 1341-1342). However, there was significant evidence that appellant was addicted to heroin and that is what led him to Foreman's house on the day of the murder. So these comments were not improper.

{¶116} Finally, appellant takes issue with comments that his version of the events was not believable. (Tr. 1279, 1285, 1335, 1338, 1345). While it is improper for a prosecutor to state that the defendant is a liar or that he believes the defendant is lying, a prosecutor may suggest that the evidence demonstrates the defendant is lying, scheming, or has ulterior motives. *State v. Kroger*, 12th Dist. No. CA99-05-050, 2000 WL 342130, *2 (Apr. 3, 2000). In this case, the prosecutor's comments suggested that appellant's version of the events was concocted in order to respond to the state's evidence. Thus, the prosecutor was arguing that appellant's version of the events did not fit the evidence presented at trial and that he made up his story in order to counter the state's evidence.

{¶117} In sum, we cannot find that the prosecutor was guilty of misconduct. Accordingly, appellant's ninth assignment of error is without merit.

{¶118} Appellant's tenth assignment of error states:

THE DEFENDANT/APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶119} In this assignment of error, appellant contends that his conviction is against the manifest weight of the evidence. He points out that the state's theory of the case was that he went to Foreman's house to rob her of her heroin. However, he notes that the evidence demonstrated he twice called 911 for Foreman and a substantial amount of money was found on the floor near her. Thus, appellant argues the evidence was clear he did not rob Foreman, nor did he kill her during the commission of a robbery. He further points out there was no forensic evidence linking him to the murder weapon, there was no blood on the bottom of his shoes, and there was no blood spatter on him. And he points out that Chief Burgess testified there were other suspects in the case.

{¶120} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id*. (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id*. at 390.

{¶121} Yet, granting a new trial is only appropriate in extraordinary cases where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Rouse*, 7th Dist. No. 04-BE-53, 2005-Ohio-6328, ¶49, citing *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Thus, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99-CA-149, 2002-Ohio-1152.

{¶122} We must consider the evidence in order to determine if the jury lost its way in finding that appellant murdered Foreman.

{¶123} Paramedic Jason Lively responded to the 911 call at approximately 4:00 p.m. He did not notice anyone outside around the house. (Tr. 197). Lively stated that the police arrived next. (Tr. 199). As Lively was talking to the officers, the front door opened and appellant walked out shirtless and covered in blood. (Tr. 199-

200). Appellant sat on the steps and advised the responding officers that "she" was "in the back." (Tr. 200). The officers went inside and Lively approached appellant to see if he was injured. (Tr. 201). Lively asked appellant what happened. (Tr. 202). Lively testified that appellant responded that "she" had attacked him, so he stabbed her. (Tr. 202). Lively then asked appellant where the knife was and appellant told him it was inside. (Tr. 202).

{¶124} Marilyn Wickline, the 911 dispatcher, testified that she received a call at 3:57 p.m. from a male advising her that he needed an ambulance. (Tr. 260-261). She stated that she also heard a faint female voice in the background say "help me." (Tr. 261). The tape recording of the call was played for the jury where they heard a male voice request an ambulance to 914 Anderson Boulevard because "the girl's hearts [sic.] hurting." (State Ex. 3).

{¶125} Richard Rudibaugh, an East Liverpool police dispatcher, testified that he received a call at 4:10 p.m. from a man who identified himself as "Andy." (Tr. 299). Andy asked Rudibaugh where the ambulance he had requested was. (Tr. 299). He then stated that he needed the ambulance at 916 Anderson Boulevard for a stabbing. (Tr. 300).

{¶126} East Liverpool Police Officer Kelsey Hedrick, along with his partner Officer Fred Flati, was the first police officer on the scene. Shortly after arriving at the Anderson Boulevard home, Officer Hedrick saw appellant come out of the front door, wearing no shirt and covered in what appeared to be blood. (Tr. 351). Officer Hedrick asked appellant what was going on and appellant responded, "She's inside." (Tr. 352). Officer Hedrick described appellant's demeanor as kind of edgy and wired. (Tr. 352). The two officers then entered the house, leaving appellant outside. (Tr. 352). The officers located Foreman lying on a bedroom floor. (Tr. 357). She told the officers that her name was Emily and that she could not breathe. (Tr. 358). Officer Hedrick then left Foreman so that the paramedics could tend to her and went to speak with appellant. (Tr. 359-360). Appellant gave Officer Hedrick his name and the officer asked him what happened. (Tr. 360). According to Officer Hedrick,

appellant responded, "I came here to buy dope. She tried to stab me." (Tr. 360).

{¶127} Officer Hedrick next ran a warrant check on both appellant and Foreman. (Tr. 361). He learned that appellant had a warrant out for his arrest. (Tr. 362). He then advised appellant of the warrant and asked him if he had anything he should not have. (Tr. 363). Appellant took a paring knife out of his pocket and laid it on the couch. (Tr. 363). Officer Hedrick then took appellant outside and placed him in the back of a patrol car. (Tr. 365).

{¶128} Later that evening Officer Hedrick, along with East Liverpool Police Chief McVay, transported appellant from the police station to the county jail. (Tr. 379). Officer Hedrick testified that during the transport, appellant began to talk about time he spent in drug rehab. (Tr. 381). Appellant further talked about his mother and how he had treated her "like shit." (Tr. 381). Appellant then stated, "I Hope God and my son forgive me." (Tr. 382). Finally, appellant stated, "I'd tell you what really happened if you weren't recording me." (Tr. 382). Officer Hedrick stated that appellant likely made this last comment because there is a mounted video camera in the cruiser; however, the camera was not recording. (Tr. 382).

{¶129} Officer Fred Flati responded to the scene with Officer Hedrick. Officer Flati stated that appellant, shirtless and covered in blood, directed them inside to Foreman. (Tr. 420-421). Officer Flati located Foreman in the back bedroom. (Tr. 423). He stated that there was blood all over the carpet, it appeared as though someone had shaken a purse out because there was money and "stuff" all over the floor, the bed was "cocked" as if there had been a struggle, and there was a knife and a lot of blood on the bed. (Tr. 424).

{¶130} Liverpool Township Police Chief Charlie Burgess responded to the scene and then went to the East Liverpool Police Department to speak to appellant. (Tr. 465). At the police department, Chief Burgess observed appellant handcuffed on a security bench. (Tr. 466). He noticed that appellant had a lot of blood covering his torso and clothing. (Tr. 466). The only injury appellant reported to Chief Burgess was a small cut on his finger. (Tr. 467). Appellant also pointed out his "track marks,"

from injecting drugs, to Chief Burgess. (Tr. 467-468). Chief Burgess then pointed out the blood on appellant in a series of photographs. (Tr. 469, 474-479; State Ex. 44-58).

{¶131} Chief Burgess next testified about other evidence. He stated that he located a paring knife with a smooth blade on the couch. (Tr. 484-485; State Ex. 14). This knife appeared to be from a set located in Foreman's mother's house. (Tr. 484-485). Chief Burgess stated that he also observed a knife on the bed in the room where Foreman was stabbed. (Tr. 486; State Ex. 17). He testified that this knife had a serrated edge. (Tr. 487). This knife contained the same writing as a set of three other serrated-edge knives located in the home. (Tr. 487-488). Chief Burgess also testified about a torn-up check that appellant's mother had given to him. (Tr. 490; State Exs. 42, 43). The check was written on Carpenter's account on the day of the murder payable to Foreman for $20. (Tr. 492-493). With Carpenter's consent, Chief Burgess searched her van where he found a crack pipe, a spoon commonly used for drugs, a burnt match, and two heroin stamp packets. (Tr. 493-498; State Exs. 10, 11, 40, 41). He located these items in the rear of Carpenter's van on the day after the murder.

{¶132} On cross-examination, Chief Burgess stated that one other possible suspect was identified during his investigation. (Tr. 513-514).

{¶133} Cheryl Carpenter testified about her contact with appellant on the day of the murder. Initially, Carpenter stated that she had put appellant out of her home due to his drug use. (Tr. 603). She stated that appellant was an addict. (Tr. 604). She even filed a criminal trespass charge against him. (Tr. 609).

{¶134} On the morning of the murder, Carpenter stated that appellant showed up at her house and asked to use the phone. (Tr. 611-612). She then agreed to take appellant to pick up his clothes from someone's house. (Tr. 615). After stopping to pick up some beer, appellant directed Carpenter to a little blue house on Anderson Boulevard because he said he needed to pick up his driver's license. (Tr. 622). Carpenter stayed in the van while appellant quickly went in and

came out of the house. (Tr. 623). Appellant got into the back seat of the van and Carpenter drove towards the house where appellant's clothes were located. (Tr. 625). When Carpenter looked back at appellant, she saw that he was shooting up heroin. (Tr. 626). When they arrived at their destination, Carpenter went in to retrieve appellant's clothes while appellant remained in the van. (Tr. 627). When she got back in the van, appellant told her to go back to the little blue house stating that he needed to get his driver's license. (Tr. 629). Appellant went into the little blue house. (Tr. 633). Carpenter then realized that appellant must have taken one of her checks from her purse when he had been alone in the van. (Tr. 633). She approached the house and appellant came out. (Tr. 636). She told him she wanted her check back and he gave it to her. (Tr. 637-638). Appellant told Carpenter that "she" would not take the check. (Tr. 638). He then demanded that Carpenter take him to Giant Eagle to get some money, but Carpenter refused. (Tr. 638-639). Instead she went home and barred appellant from coming into the house with her. (Tr. 640-642).

{¶135} Additionally, Carpenter testified that she provided Chief Burgess with the torn up check and allowed him to search her van. (Tr. 644, 648).

{¶136} Joan Cooper is Kim Koerber's sister and Foreman's aunt. She testified that on the day in question she was driving down Anderson Boulevard on her way to work at approximately 3:40 p.m. (Tr. 689). She looked towards Koerber's house and noticed Foreman standing on the front porch with a tall male, whom she later identified as appellant. (Tr. 686, 690).

{¶137} East Liverpool Police Chief Michael McVay testified that appellant was initially arrested on a warrant for trespassing. (Tr. 714). He also testified about the conversation he had with appellant during appellant's transport to jail. Chief McVay stated that appellant spoke of his drug problem and attempt at rehabilitation. (Tr. 717). Appellant then told Chief McVay that he had caused his mother a lot of problems due to his addiction. (Tr. 718). As appellant was talking about his child, he told Chief McVay that he hoped God and his child would forgive him for what he had

done. (Tr. 719). Finally, appellant told him, "You know, I'd tell you what really happened up there, if you weren't recording me." (Tr. 719).

**{¶138}** Chief McVay also testified that while appellant was under arrest at the scene awaiting transport, he asked Chief McVay three times how Foreman was doing. (Tr. 725).

**{¶139}** Edward Carlini is a BCI crime scene investigator who investigated the murder scene. He testified that there appeared to be blood washed off in the sink. (Tr. 761-762). He also stated that he collected the serrated steak knife, which appeared to have blood stains on it. (Tr. 770). Carlini additionally recovered a blood-covered tee-shirt from the bedroom. (Tr. 778-779). And Carlini made note of what appeared to be the contents of a purse lying on the bedroom floor. (Tr. 782). The contents included some blood-stained money and a wrapper from a heroin pack. (Tr. 782-783).

**{¶140}** Dawn Limpert is a BCI latent print examiner who examined several fingerprints from the scene. She was able to identify two fingerprints from the storm door as appellant's fingerprints. (Tr. 859). Limpert also testified that the knives, the syringe box, and syringe packages that were submitted did not contain sufficient ridge detail for her to make a fingerprint comparison. (Tr. 860-861).

**{¶141}** Jennifer Acurio is a BCI forensic chemist who tested the crack pipe and spoon found in Carpenter's van and a spoon found in the sink of the Koerber residence. She testified that the crack pipe contained cocaine and the two spoons contained heroin. (Tr. 908).

**{¶142}** Linda Eveleth a BCI biologist testified that the DNA inside of the purse found in the bedroom where Foreman was stabbed was consistent with both appellant's and Foreman's DNA. (Tr. 919). She further stated that DNA from the murder weapon, a tee shirt found at the scene, a stain from the kitchen counter, appellant's shoe, and appellant's shorts were consistent with Foreman's DNA. (Tr. 920). Eveleth also testified that the DNA from a beer bottle found in the kitchen was consistent with appellant's DNA. (Tr. 921).

{¶143} Dr. Erica Armstrong is a deputy coroner at the Cuyahoga County Coroner's Office who performed an autopsy on Foreman's body. She testified that both of Foreman's lungs were punctured. (Tr. 1021). Dr. Armstrong further stated that heroin metabolites were present in Foreman's blood. (Tr. 1028). She concluded that Foreman's cause of death was multiple stab wounds of the trunk with visceral and soft tissue injuries. (Tr. 1032). She also noticed a number of wounds that were consistent with defensive wounds. (Tr. 1032).

{¶144} Michael Linville was riding his bicycle on Anderson Boulevard at approximately 3:45 p.m. on the day of the murder. Linville testified that he thought he heard a scream when he was about an eighth of a mile away from Koerber's house. (Tr. 1135). He further stated that he noticed a light blue car parked in front of the house. (Tr. 1137). Linville stated that he saw a man sitting in the car who looked a lot like appellant. (Tr. 1137-1138). However, on cross-examination Linville stated that he did not go to the police with this information until almost nine months after the murder. (Tr. 1144).

{¶145} Beverly Scott lives on Anderson Boulevard, two houses down from Koerber's residence. Scott testified that while she was sitting in her living room, she heard a scream at approximately 3:50 p.m. on the day in question. (Tr. 1151).

{¶146} Appellant was the final witness. He first divulged his criminal record that consisted of two theft offenses, domestic violence, vandalism, and criminal trespassing. (Tr. 1159-1160).

{¶147} On the morning of the murder, appellant stated that he went to Carpenter's house to get some clothes, take a bath, and get some money for groceries. (Tr. 1161). He asked Carpenter to take him to pick up his clothes, which were at a friend's house. (Tr. 1162). His mother agreed. (Tr. 1163). On the way to pick up his clothes, they stopped at Foreman's house. (Tr. 1163). Appellant wanted to purchase some drugs but he did not tell his mother that was the reason he wanted to stop there. (Tr. 1164). Appellant bought three stamps of heroin from Foreman. (Tr. 1165). He paid Foreman $10 that he had with him but he still owed her $20

more. (Tr. 1165). Appellant stated Foreman told him that she owed money to someone and the way she looked at him scared him. (Tr. 1165). Appellant and Carpenter next went to retrieve his clothes. (Tr. 1166). While Carpenter went into the house to get appellant's clothes, appellant stole a check from her checkbook and wrote it out to Foreman in the amount of $20. (Tr. 1166). Carpenter returned to the car and appellant directed her back to Foreman's house. (Tr. 1166). Appellant stated that he gave Foreman the check, but then Carpenter came to the door, so Foreman refused the check. (Tr. 1167). Appellant and Carpenter left Foreman's house and returned to Carpenter's house. (Tr. 1168). But Carpenter would not let appellant in her house. (Tr. 1170).

{¶148} Appellant testified that he was embarrassed because he "shot up" in front of his mother and stole from her. (Tr. 1171).

{¶149} After leaving Carpenter's house, appellant walked back to Foreman's house. (Tr. 1172). Appellant stated that he and Foreman hung out and talked for a while in the house. (Tr. 1173). Then they went outside to the backyard. (Tr. 1174). Eventually, appellant stated that Foreman went back inside and he stayed out in the backyard sitting at a table. (Tr. 1176). He stated that he was drunk and high at the time. (Tr. 1176). He stated that he "nodded off." (Tr. 1177-1178). Appellant was unsure how long he was outside at the table. (Tr. 1179).

{¶150} Appellant testified that he then went back in the house and grabbed a beer from the refrigerator. (Tr. 1179). It was then that he heard a moan from the bedroom. (Tr. 1179). Appellant stated he went to the bedroom and discovered Foreman kneeling down. (Tr. 1180). Appellant testified that Foreman turned towards him with her arms flailing and came straight at him. (Tr. 1180). He stated that he grabbed her and held her. (Tr. 1180). When Foreman realized it was appellant, he stated that she then "gave up" and her body went limp. (Tr. 1180). Appellant stated that he laid her down. (Tr. 1181). He then asked her where her phone was and upon learning that it was in her purse, appellant dumped the contents of her purse out. (Tr. 1181). He then called 911. (Tr. 1181). Appellant stated he realized that

someone might be in the house so he ran to the kitchen and grabbed a paring knife from the drawer. (Tr. 1182).

**{¶151}** Appellant stated that the paramedics arrived. (Tr. 1184). He testified that he told Lively that "she attacked me" and that "he stabbed her." (Tr. 1185). Appellant stated that he never told Lively that he was the one who stabbed Foreman. (Tr. 1185). Appellant further stated he told Officer Hedrick that he was there for "dope" and that Foreman came at him and attacked him. (Tr. 1185). He stated he tried to tell Officer Hedrick the rest of the story but the officer turned around and went into the bedroom. (Tr. 1185).

**{¶152}** Appellant also testified he did not see anything at Foreman's house and did not have any information as to who stabbed her. (Tr. 1192-1193). Finally, appellant testified he did not stab Foreman. (Tr. 1194).

**{¶153}** Given the evidence, we cannot conclude that the jury's verdict was against the manifest weight of the evidence. Appellant testified as to his version of the time in question. According to appellant, he was at Foreman's house in the backyard when she was stabbed, yet he did not hear or see anything. By his own testimony, appellant was drunk and high at the time. Also, by his own testimony, appellant was so desperate for heroin that he had his mother drive him to buy the heroin and "shot up" in front of her.

**{¶154}** But appellant's testimony that he was simply present at Foreman's house and did not stab her does not match up with the rest of the evidence.

**{¶155}** According to the first responders on the scene, appellant made some highly incriminating statements. Lively testified that appellant told him that "she" attacked him, so he stabbed her and the knife was inside the house. And Officer Hedrick testified appellant told him that he went to Foreman's to buy dope and Foreman tried to stab him. Furthermore, the first responders found appellant shirtless and covered in blood. Yet appellant was not injured. A blood-covered tee-shirt was located in the bedroom where Foreman was stabbed. DNA from the blood covering appellant and on the tee-shirt was determined to be consistent with Foreman's DNA.

{¶156} Moreover, appellant was seen on Foreman's front porch with her at approximately 3:40 p.m. At 3:57 p.m., he placed his first call to 911. Thus, in order for his version of the events to add up, appellant would have had to go into the backyard, nod off, wake up, go inside and find Foreman bleeding in less than 17 minutes. Additionally, someone else would have had to enter the house, stab Foreman, and leave within that same short timeframe.

{¶157} Although an appellate court is permitted to independently weigh the credibility of the witnesses when determining whether a conviction is against the manifest weight of the evidence, great deference must be given to the fact finder's determination of witnesses' credibility. *State v. Wright*, 10th Dist. No. 03AP-470, 2004-Ohio-677, ¶11. The policy underlying this presumption is that the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Id.*

{¶158} In this case, the jury simply did not find appellant's testimony credible. We will not second-guess their determination.

{¶159} For these reasons, the jury's verdict was not against the manifest weight of the evidence. Accordingly, appellant's tenth assignment of error is without merit.

{¶160} Appellant's eleventh assignment of error states:

DEFENDANT/APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL DUE TO THE CUMULATIVE ERRORS IN THESE PROCEEDINGS.

{¶161} Appellant contends here that the cumulative effect of the errors raised in his first ten assignments of error deprived him of a fair trial.

{¶162} An appellate court may reverse a defendant's conviction based on the doctrine of cumulative error. Cumulative error occurs when errors deemed separately harmless deny the defendant a fair trial. *State v. DeMarco*, 31 Ohio St.3d 191, 509

N.E.2d 1256 (1987), paragraph two of the syllabus.

{¶163} As discussed herein, appellant's alleged errors are without merit. Consequently, there is no cumulative error. Accordingly, appellant's eleventh assignment of error is without merit.

{¶164} For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, P.J., concurs.

DeGenaro, J., concurs.