[Cite as *State v. Barrow*, 2012-Ohio-5058.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97920**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## PATRICIA BARROW

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-543005

**BEFORE:** S. Gallagher, J., Blackmon, A.J., and Jones, J.

**RELEASED AND JOURNALIZED:** November 1, 2012

**ATTORNEYS FOR APPELLANT**

Thomas E. Shaughnessy
11510 Buckeye Road
Cleveland, OH   44104

Michael V. Heffernan
75 Public Square
Suite 700
Cleveland, OH   44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: James Hofelich
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, OH   44113

SEAN C. GALLAGHER, J.:

{¶1} Defendant-appellant, Patricia Barrow, appeals from her conviction for murder in violation of R.C. 2903.02. For the reasons set forth below, we affirm the conviction.

{¶2} At approximately 3:00 p.m. on September 27, 2010, William Benford and Ozelle Carrington were walking down Superior Avenue in East Cleveland when they stopped between two buildings near East 125th Street to relieve themselves. Benford smelled "something dead" and thought it was an animal. He saw, however, through a window in an abandoned building, a woman's body, face down. Carrington reported the discovery of the body to the East Cleveland Police Department.

{¶3} Elizabeth A. Douglas, M.D., performed the autopsy of the victim, Diane Cloud, on September 28, 2010, and later testified at trial. The doctor found multiple contusions all over Cloud's body. Most of the contusions were caused by blunt force impact while Cloud was still alive. There were multiple items around Cloud's neck, including pants, a pair of stockings, and a trash bag. The cause of death was asphyxiation and suffocation by ligature strangulation. The estimated date of death was September 21, 2010. The doctor could not provide a specific date of death because Cloud was killed somewhere other than the abandoned building. When questioned about how much force it would take to strangle Cloud, Dr. Douglas testified, "[i]t would not

take more than moderate force. It actually only requires four pounds of moderate pressure to occlude the jugular veins."

{¶4} The state's key witness was Milton Jones. Jones testified that in the early evening on September 18, 2010, he met Cloud and his girlfriend, Barrow, in an area known as "The Clock" on East 105th Street and St. Clair Avenue. They stopped at a store to buy cigarettes and beer as they walked to Jones and Barrow's apartment.

{¶5} Barrow and Cloud started arguing once they arrived at the apartment. A physical fight started in the bedroom after Cloud "charged" Barrow. Cloud sustained a bloody nose at some point during the fight. Jones eventually left the bedroom when the fighting escalated because he was tired and wanted to fall asleep. Although he asked them to stop fighting, he did not want to become physically involved in the fight. He continued to watch, however, from the living room through a large hole in the wall. The fighting eventually stopped, and Cloud quieted down.

{¶6} Jones heard Cloud ask Barrow if she could leave the apartment. Barrow refused to let her go when Cloud threatened to tell the police that Barrow kidnapped her.

{¶7} Barrow retrieved a phone cord from one of Jones's plastic bags in the living room and returned to the bedroom. Jones heard Cloud crying and saw Barrow next grab a skillet from the kitchen. Although Jones could not see Cloud's body on the bedroom floor, it appeared to him that Barrow was hitting her with the skillet. It then looked like Barrow was tying up Cloud with the phone cord. Just before he fell asleep, Jones saw Barrow grab a plastic trash bag and tie it around Cloud's head. Jones planned on later

removing the trash bag from Cloud's neck when Barrow was asleep, but he fell asleep before he had the chance.

{¶8} Jones woke up the next morning and overheard a boy, who was walking by Jones and Barrow's apartment window, talk about a nude woman on the floor. Barrow was sitting on the floor next to Jones. Barrow told Jones that Cloud was dead. After confirming the death, Jones and Barrow made plans to remove Cloud's body from the apartment.

{¶9} Jones and Barrow went to Jones's cousin's house on Sunday, September 19, 2010, and brought a shopping cart back to their apartment. Jones wrapped Cloud's body in a blanket and placed it in the cart. Later that day, Jones walked the cart with the body to an abandoned building, and placed the body, face down, inside the building. He removed the blanket and later threw it in a trash bin where he also left the cart. Jones learned that Cloud's body was discovered a week or so after he moved her body to the abandoned building.

{¶10} According to Jones, on the same day that he moved Cloud's body to the building, Barrow sold Cloud's cell phone to Bellal Mahmoud at around noon. Mahmoud owned a local convenience store.

{¶11} Consistent with Mahmoud's testimony at trial, the log for Cloud's cell phone showed that Mahmoud called his other store in Akron, Ohio, just after noon on September 19, 2010. Mahmoud also identified Barrow in a photo array on October 4, 2010, and at trial, as the person who sold him Cloud's phone.

{¶12} Ronnie Washington, Barrow's former boyfriend, testified that Jones and Barrow asked him in late September for help in finding them a place to stay because it was cold inside their apartment due to a broken window. Washington told them that they could stay with him for a night. He then took Barrow and Jones to a local gas station in order for Barrow to withdraw money from an ATM. While at the station, Washington overheard someone tell Jones that the police were looking for both Jones and Barrow. Barrow looked nervous and shocked, and she wanted to "get out of there."

{¶13} The next day, Washington took them to a hotel and rented them a room in his name for one week. After seeing pictures of Jones and Barrow on the news, he reconsidered his actions and contacted the police. Washington told the police where they could find Jones and Barrow because he did not want to be implicated in the murder. The police arrested Jones and Barrow at the hotel.

{¶14} On October 19, 2010, Barrow was indicted for Count 1, aggravated murder in violation of R.C. 2903.01(A), with a felony murder specification; Count 2, aggravated murder in violation of R.C. 2903.02(B), with a felony murder specification; Count 3, kidnapping in violation of R.C. 2905.01(A); and Count 4, gross abuse of a corpse in violation of R.C. 2927.01(B).

{¶15} On September 6, 2011, the trial court granted the state's motion to dismiss the felony murder specifications on the first two counts of aggravated murder. Jury trial commenced on November 28, 2011. On December 9, 2011, the jury returned a verdict of

not guilty in Count 1, but guilty of the lesser included offense of murder under R.C. 2903.02. The jury found Barrow not guilty on the remaining three counts of the indictment. The trial court sentenced Barrow on January 3, 2012, to 15 years to life.

{¶16} The state also indicted Jones on October 19, 2010, for aggravated murder, involuntary manslaughter, kidnapping, and abuse of a corpse. In exchange for his agreement to testify against Barrow, the state amended the indictment and nolled the aggravated murder charge. Jones pleaded guilty on July 14, 2011, to the remaining three counts, as amended. The trial court sentenced him to seven years on each of Counts 2 and 3, involuntary manslaughter and kidnapping, and to twelve months on Count 4, abuse of a corpse. The court ordered the sentences to be served concurrently, and added mandatory postrelease control of five years on Counts 2 and 3, and discretionary postrelease control of three years on Count 4.

{¶17} Barrow timely appealed her conviction, and asserts three assignments of error. She claims the trial court violated her right to confrontation and denied her due process by limiting the cross-examination of the state's witness, Mahmoud, and not allowing her to proffer evidence. Barrow also asserts her conviction is against the manifest weight of the evidence and not supported by sufficient evidence. Finally, she submits the trial court denied her due process by not providing her with complete DNA testing of evidence taken from the abandoned building. Upon a review of the record, we find Barrow's arguments have no merit.

{¶18} In her first assignment of error, Barrow asserts that Mahmoud's testimony was critical in establishing her involvement in Cloud's death because he identified Barrow as the person who sold him Cloud's cell phone. When Mahmoud admitted to using the cell phone for personal use, defense counsel inquired about who he called and the content of those calls. The state objected to this line of questioning, and the trial court sustained the objections. The trial court also denied defense counsel's request for a sidebar. Barrow argues that the trial court's actions violated her right to confrontation and denied her due process by limiting the cross-examination of Mahmoud and not allowing her to proffer evidence. She further argues that the inconsistencies in Mahmoud's testimony heightened the need for deeper inquiry by defense counsel, but through its evidentiary rulings, the trial court prevented counsel from conducting the inquiry.

{¶19} The trial court correctly refused to accept Barrow's proffer because this evidence was properly excluded on cross-examination. *State v. Hartford*, 21 Ohio App.3d 29, 486 N.E.2d 131 (8th Dist.1984). It has long been recognized that counsel may not proffer the potential answer of an adversary's witness after the trial court sustains an objection to a question because counsel does not know how the witness will answer the question. *See Burt v. State*, 23 Ohio St. 394, 402-403 (1872); *Cleveland v. Prihoda*, 8th Dist. No. 65778, 1994 Ohio App. LEXIS 1205 (Mar. 24, 1994). The Staff Note to Evid.R. 103(A)(2) specifically recognizes that trial courts are not required to indulge counsel's request to proffer such material into the record, stating in pertinent part:

"Upon objection on cross-examination, an offer of proof is dispensed with for the reason that it would be impracticable to speculate on the potential answer."

{¶20} Under the circumstances, Barrow fails to exemplify any error concerning the scope of cross-examination or her opportunity to proffer material into the record. Additionally, we do not find that Mahmoud's testimony was "wrought" with inconsistencies as advanced by Barrow.

{¶21} Her first assignment of error is, therefore, overruled.

{¶22} Barrow challenges her conviction in her second assignment of error. She argues that it is both against the manifest weight of the evidence and not supported by sufficient evidence. The only DNA evidence linking either Jones or Barrow to Cloud's body was a piece of candy recovered from one of the bags around her head. The DNA tested on the candy was Jones's DNA. According to Barrow, the combination of this DNA evidence, Jones's mental illness, and Jones's motivation to enter into a plea agreement, makes Jones not a credible witness. Barrow asserts the jury clearly lost its way, therefore, in relying on his testimony to convict her of Cloud's murder.

{¶23} When an appellate court reviews a claim of insufficient evidence, "'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. The weight to be given the evidence

and the credibility of the witnesses are primarily for the trier of fact. *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶24} On the other hand, the weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *State v. Robinson*, 8th Dist. No. 96463, 2011-Ohio-6077, ¶ 14, citing *State v. Brindley*, 10th Dist. No. 01AP-926, 2002-Ohio-2425, ¶ 16. When presented with a challenge to the manifest weight of the evidence, an appellate court, after

> "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*

{¶25} Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis, that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *Cleveland v. Kirkpatrick*, 8th Dist. No. 94950, 2011-Ohio-2257, ¶ 26, citing *State v. Braxton*, 10th Dist. No. 04AP-725, 2005-Ohio-2198, ¶ 15. "'[T]hus,

a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.'" *Kirkpatrick*, quoting *Braxton* at ¶ 15.

{¶26} In applying the applicable standard, we conclude the weight of the evidence supports Barrow's conviction for murder. During trial, the jury observed Barrow's videotaped interview with the police. The jury also participated in a jury view of the relevant locations. Barrow admitted during her police interview that Cloud was at her apartment on September 18, 2010. According to her, Cloud left the apartment at about 4:00 a.m. on September 19, 2010.

{¶27} Jones testified that Barrow and Cloud fought on and off that night for several hours. Cloud sustained a bloody nose during the fight, and the police found her blood on the bedroom floor. Barrow at some point grabbed a phone cord, a skillet, and a plastic bag. When Cloud was on the floor, Barrow beat her with the skillet. Jones thought he saw Barrow bind Cloud with the cord, and he saw Barrow tie a plastic bag around Cloud's head. When Jones woke up the next morning, Barrow told him Cloud was dead. Jones saw Cloud on the bedroom floor. Her head was covered, and she was bound with the phone cord. On the same day that Jones disposed of the body, Barrow sold Cloud's phone to Mahmoud. Mahmoud identified Barrow, both at trial and in a pretrial photo array, as the person who sold him the phone.

{¶28} Dr. Douglas corroborated Jones's testimony. She testified that Cloud's contusions were caused by blunt force trauma while she was still alive. Consistent with

Barrow tying items around Cloud's neck, the cause of death was asphyxiation and suffocation by ligature strangulation.

{¶29} Finally, Washington testified that in late September, he rented a room in his name at a hotel for Jones and Barrow's use. He rented the room even though he overheard that Jones and Barrow were wanted by the police in connection with the body found in the abandoned building. After seeing pictures of Jones and Barrow on the local news, and fearing the police would think he was involved because of the hotel room registration in his name, Washington called the police and told them of Jones and Barrow's location.

{¶30} As to Jones's credibility, the jury heard his testimony. His direct testimony included his explanations for not helping Cloud or calling the police, for moving Cloud's body, and for entering the plea agreement. Jones also testified about his mental illness and how a piece of candy with his DNA on it ended up in a bag wrapped around Cloud's head. The jury was free to believe Jones's testimony about Barrow's actions despite his mental illness, the DNA evidence, Jones's unwillingness to intervene in the fighting, and his willingness to nonetheless move Cloud's body and later testify against Barrow.

{¶31} We find the jury did not clearly lose its way and create such a manifest miscarriage of justice requiring a reversal of Barrow's conviction and an order for new trial. *Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. Our finding that the conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *Kirkpatrick*, 8th Dist. No. 94950, 2011-Ohio-2257.

{¶32} Barrow's second assignment of error is accordingly overruled.

{¶33} For her third assignment of error, Barrow relies on the forensic laboratory's failure to test several pieces of evidence that were taken from the abandoned building. These items are a rug found under Cloud, a piece of wood with reddish-brown staining found near Cloud's pelvis, a clump of hair imbedded in the piece of wood, a red bra found near Cloud's body, a condom wrapper in proximity to the body, and several other items, including hair and clothing. Barrow speculates that this evidence may have implicated Jones in Cloud's murder beyond his moving of her body. It also may have identified a third party's DNA, and helped to establish Barrow's defense that someone else murdered Cloud. Barrow argues, therefore, that her right to a fair trial was denied because the laboratory's failure to test all the evidence for DNA is "tantamount to withholding exculpatory evidence."

{¶34} The other items identified by Barrow were submitted to, but not tested by, the Cuyahoga County Regional Forensic Science Laboratory in the office of the Cuyahoga County Medical Examiner. Defense counsel asked Carey Baucher, the DNA scientist for this case, to identify the party who determines what items are subject to DNA testing in a case. She responded initially that it was her ultimate decision. Defense counsel spent a considerable amount of time questioning Baucher as to why she did not test all items. Counsel then went through each item that was not tested and asked why it was not tested, to which Baucher replied with an explanation. Baucher also testified when questioned as to why she did not test a pair of pants removed from Cloud's neck:

Basically because we were already testing things from around the victim and gathered with the victim, so we already covered that portion, so we did not test them.

It doesn't mean that it could never have been tested. If there was — with any of the items that aren't tested, once the report goes out, we honor requests from prosecution, defense, and police agencies as to, Hey, we think this one would have been also important to us. Could you test that as well?

**{¶35}** Defense counsel had a clear strategy of attempting to show that the state failed to conduct a thorough investigation in this case. As this was a strategic decision on defense counsel's part, we will not second-guess it. *State v. Irwin*, 7th Dist. No. 11-CO-6, 2012-Ohio-2704, ¶ 107, citing *State v. Carter*, 72 Ohio St.3d 545, 558, 1995-Ohio-104, 651 N.E.2d 545.

**{¶36}** Further, Barrow does not allege that the state destroyed or failed to preserve evidence; rather, she claims due process required DNA testing of all items removed from the abandoned building. However, "[t]he right to due process is not violated when investigators fail to use a particular investigatory tool." *State v. Martin*, 10th Dist. No. 06AP-301, 2007-Ohio-232, ¶ 15, citing *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). *See also Athens v. Gilliland*, 4th Dist. No. 02CA4, 2002-Ohio-4347, ¶ 5 (there is a difference between failing to create evidence and destroying it; the due process clause is not violated when police fail to utilize a particular investigative tool; sloppy police work does not violate a defendant's due process rights).

**{¶37}** Barrow's counsel was free to argue, and in fact argued, that testing the other items could have produced exculpatory evidence. The police were not, however, constitutionally required to test these items. Furthermore, the record supports the position that these items were and still are available for DNA testing, but Barrow only speculates that testing these items would produce evidence in her favor. Speculation alone does not require a reversal of her conviction. *See State v. Dingess*, 10th Dist. No. 10AP-848, 2011-Ohio-5659.

**{¶38}** Finally, Barrow's reliance on *State v. Siller*, 8th Dist. No. 90865, 2009-Ohio-2874, in support of this assignment of error is misplaced because *Siller* dealt with a motion for new trial based on newly discovered evidence. Because Barrow could have requested DNA testing on any other item, but did not, she is foreclosed from pursuing this argument.

> 'The legitimate state interest in orderly procedure through the judicial system is well recognized as founded on the desire to avoid unnecessary delay and to discourage defendants from making erroneous records which would allow them an option to take advantage of favorable verdicts or to avoid unfavorable ones.'

*State v. 1981 Dodge Ram Van*, 36 Ohio St.3d 168, 171, 522 N.E.2d 524 (1988), quoting *State v. Awan*, 22 Ohio St.3d 120, 122-123, 489 N.E.2d 277 (1986).

**{¶39}** Accordingly, Barrow's third assignment of error is without merit.

**{¶40}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

SEAN C. GALLAGHER, JUDGE

PATRICIA ANN BLACKMON, A.J., and
LARRY A. JONES, SR., J., CONCUR